# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CENTRAL STATES, SOUTHEAST ) 
AND SOUTHWEST AREAS PENSION ) 
FUND, and HOWARD McDOUGALL, ) 
trustee, ) 
      **Plaintiffs,** ) 
 ) 
**v.** )      **No. 04 C 6838**
 ) 
GEORGE W. BURNETT, INC., a New ) 
York corporation, and LAKE ERIE ) 
TRANSPORTATION COMPANY, INC., ) 
a New York Corporation, )      **Judge Ruben Castillo**
 ) 
      **Defendants.** ) 

## MEMORANDUM OPINION AND ORDER

Plaintiff, Central States, Southeast and Southwest Areas Pension Fund ("the Pension

Fund") and its trustee, Howard McDougall (collectively "Plaintiffs"), brought suit against

Defendants, George W. Burnett, Inc. ("Burnett") and Lake Erie Transportation Company, Inc.

("Lake Erie") (collectively "Defendants") pursuant to Section 515 of the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145, to collect delinquent pension

contributions exceeding $1.8 million dollars. Plaintiffs allege that between 1993 and 2004,

Burnett entered into labor contracts, or collective bargaining agreements ("CBAs") that required

it to remit contributions on behalf of its cement truck drivers and prohibited the assignment of

cement hauling, known in the CBAs as "bargaining unit work," to anyone other than employees

covered by the CBAs. (R. 1, Pls.' Mem. in Supp. of Summ. J. At 1.) Plaintiffs argue that

Burnett violated ERISA by failing to pay contributions on behalf of Lake Erie employees based

on the single employer doctrine and the alter ego theory. Plaintiffs also argue that the individuals

Burnett hired as owner-operators are in fact employees and Burnett is liable for contributions on behalf of these individuals. Plaintiffs also allege as an alternative argument that Burnett violated the CBAs by hiring individuals other than Burnett employees to haul cement. (*Id.*) Defendants argue that it did not owe contributions on behalf of Lake Erie employees because it lacked the requisite intent to evade union obligations. (R. 49, Defs.' Mot. for Summ. J. at 2.) Defendants further argue that it is not liable for contributions on behalf of its owner-operators because the owner-operators were independent contractors, not employees. (*Id.*) Currently before this Court are the parties' cross motions for summary judgment. (R. 41, Pls.' Mot. for Partial Summ. J; R. 40, Defs.' Mot. for Summ. J.) Defendants have moved for summary judgment on all claims and Plaintiffs have moved for summary judgment on the issue of liability.

## RELEVANT FACTS[1]

### I.    The Parties

The Pension Fund is an employee benefit plan and trust associated with the International Brotherhood of Teamsters ("IBT") and administered in the Eastern District of the Northern District of Illinois, and McDougall is a trustee and fiduciary of the Pension Fund. (R. 48, Pls.' Resp. to Defs.' Facts ¶¶ 1-2.) The Pension Fund is primarily funded by contributions remitted by multiple participating employers pursuant to the CBAs and Pension Fund Trust Agreements ("PFTA") with local unions affiliated with IBT. (R. 53-1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l Facts ¶ 4.) All principal and income from such contributions and investments is used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the

---

[1] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

2

Pension Fund and paying the administrative expenses of the Pension Fund. (*Id.*)

Burnett is a New York corporation with its principal place of business in the State of New York. (R. 48, Pls.' Resp. to Defs.' Facts ¶ 3.) Burnett is engaged in the business of trucking as a hauler of general commodities. (*Id.*) Burnett entered into a series of CBAs with Local Union No. 449 of the IBT ("Union") covering the period from July 1, 1990 through December 31, 2008, which required it to pay contributions to the Pension Fund on behalf of covered employees, namely truck drivers hauling cement. (*Id.* ¶ 3; R. 53-1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l Facts ¶ 54.) Since 1992, cement has constituted approximately thirty to thirty-five percent of Burnett's hauling business and asphalt has constituted approximately sixty percent of its business. (R. 53.1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l Facts ¶¶ 85-86.)

Lake Erie is also a New York corporation with its principal place of business in the State of New York. (R. 48, Pls.' Resp. to Defs' Add'l Facts ¶ 4.) Lake Erie is engaged in the business of trucking as a hauler of general commodities, but it has never signed an agreement the Union. (*Id.* ¶ 3.)

## II.  The Establishment of Lake Erie

The predecessor to Lake Erie was B & B Trucking, which was formed in the late 1950s by John Bauer and Richard Borowiak, as fifty-fifty owners. (R. 48, Pls.' Resp. to Defs. Facts ¶ 9.) B&B Trucking started with nine trucks, which delivered U.S. mail and hauled steel. (*Id.* ¶ 10.) In 1961, Lake Erie was incorporated, and it started with seven or eight non-union employees consisting of truck drivers and mechanics. (*Id.* ¶¶ 11-12.) In approximately 1962 or 1963, Bonded Freightways, a carrier for the New York Central Railroad ("NY Central"), which transported cement by rail from plants in New York, hired Lake Erie as an independent

3

contractor. (*Id.* ¶ 13.) In light of this new business, Lake Erie increased its fleet to ten trucks and employed a total of ten drivers. (*Id.* ¶ 14.) Soon thereafter, Bonded Freightways went bankrupt and NY Central hired Lake Erie to be its carrier. (*Id.* ¶ 15.) At first, Lake Erie operated under the Public Service Commission Authority ("PSC authority") of Bonded Freightways. (*Id.* ¶ 16.) However, in order to continue doing business for NY Central, Lake Erie needed to obtain permanent PSC authority. (*Id.* ¶ 17.)

## III.    The Establishment of Burnett

In approximately 1968, the shareholders of Lake Erie bought the stock of Burnett. At the time, Burnett was a dormant company in possession of PSC authority to haul cement and building materials. (R. 48, Pls.' Resp. to Defs.' Facts ¶ 18.) Burnett initially had no assets or employees and hauled cement with Lake Erie drivers and trucks, but eventually, it began hiring its own drivers. (*Id.* ¶ 19.) In the 1970s, Burnett entered into an agreement with the Union to regulate its drivers who hauled cement. (*Id.* ¶ 20.) Throughout the 1970s, Burnett drivers solely hauled cement for Burnett's customers and Lake Erie drivers solely hauled mail and other non-cement commodities for Lake Erie's customers. (*Id.* ¶ 22.)

The cement hauling business is seasonal, and in the early 1970s, Burnett would have up to twelve drivers, but at the close of the season, Burnett would lay off most, and sometimes all, of its drivers at the close of the summer season. (*Id.* ¶ 23.) Burnett never kept more than three cement drivers employed during the off-season, and each spring, Burnett would recall all of its drivers, though many would not return. (*Id.*) Burnett would advise the Union of the drivers who were laid off and of the drivers who were returning, and the Union made no objection. (*Id.* ¶ 27.) By the mid-1970s, Burnett hired four or five independent contractors ("ICs") to haul cement. (*Id.*

4

¶ 25.)[2]

In about 1979 or 1980, Burnett began to assign loads to Lake Erie. (*Id.* ¶ 26.) In the 1980s and 1990s, the cement hauling business suffered greatly, and by the early 1990s, Burnett was down to two drivers, both of whom were Union members. (*Id.* ¶ 28.) In the late 1990s, the cement hauling business picked up again and Burnett began doing more work. (*Id.* ¶ 29.) Plaintiffs, however, dispute whether there was ever a shortage of drivers and whether Burnett's business suffered, thereby forcing it to hire owner-operators/ICs and assign loads to Lake Erie. (*Id.* ¶ 26, 29.) Nevertheless, Burnett had only two drivers employed, so Burnett continued to subcontract the work to owner-operators/ICs and to Lake Erie during this period. (*Id.*)

From 1992 until the present, Burnett and Lake Erie have been owned fifty/fifty by Eric Bauer and Richard Borowiak. (R. 53-1, Defs.' Resp. to Pls.' Facts ¶ 54, 55.) Borowiak serves as Burnett's president and Lake Erie's vice president, and Bauer serves as Lake Erie's president and Burnett's vice-president. (*Id.* ¶¶ 56-59.) From 1992 through the present, Bauer and Russ Deviso, the general manager of both Burnett and Lake Erie, have been responsible for the day-to-day operations of both companies. (*Id.* ¶¶ 64-65.) However, both Bauer and Deviso receive their salary from Burnett and no compensation from Lake Erie. (*Id.* ¶¶ 72-73.) From 1992 through the present, Deviso has been responsible for the accounts receivable and the accounts payable functions at both companies. (*Id.* ¶ 103-104.) Similarly, Bauer has been responsible for bidding on the contracts for Burnett and Lake Erie. (*Id.* ¶ 105-106.) Burnett and Lake Erie also

---

[2] Hereinafter, we will refer to these individuals as owner-operators/ICs since the parties dispute whether the owner-operators were independent contractors or employees. Defendants claim throughout its filings that it never designated these individuals as owner-operators or employees, but hired them as independent contractors.

share the same corporate counsel and the same accountant; its employees share the same 401(k) plan; and both companies are covered by a joint liability insurance policy. (*Id.* ¶¶ 74-77.) Burnett and Lake Erie also have prepared combined financial statements, but the two companies have separate bank accounts at the same institution. (*Id.* ¶¶ 80, 82.) Burnett employees not covered by the CBAs and Lake Erie employees have the same two options for health care. (*Id.* ¶ 81.) Burnett and Lake Erie share the same fax number, internet electronic mail address, office equipment, and utilities expenses, but they have different phone numbers. (*Id.* ¶¶ 98-101; R. 56-1, Pls.' Resp. to Defs.' Add'l Facts ¶ 179.) Burnett and Lake Erie also share the same business premises. (R. 53-1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l Facts ¶ 94.) Since 1999, Burnet has owned the property where Burnett and Lake Erie operate, but Lake Erie has not paid any rent to Burnett. (*Id.* ¶ 95.)

From 1992 until the present, Burnett has employed one full-time office employee, Dorothy Graffius, other than Bauer and Deviso. (*Id.* ¶ 107.) Graffius has performed duties on behalf of Lake Erie and Burnett, including the payroll, human resource functions, and general paperwork. (*Id.* ¶¶ 109-110.) Employees on the payroll of Burnett have performed office and administrative functions for Lake Erie but were not compensated by Lake Erie for their services. (*Id.* ¶ 111.) In fact, during this same period, Lake Erie has not had any office employees on its payroll. (*Id.* ¶ 108.) Furthermore, employees of both companies, such as welders and mechanics, work on equipment belonging to either company, even though they are either on Lake Erie or Burnett's payroll but not both. (*Id.* ¶ 115-116.)

From 1992 until the present, there were no any written agreements or formal division of expenses between Lake Erie and Burnett regarding drivers on the payroll of Lake Erie driving

6

trucks owned by Burnett to haul cement for Burnett customers. (*Id.* ¶¶ 78-79.) Both Lake Erie and Burnett drivers, however, are supervised by Bauer and Deviso. (*Id.* ¶122.) Bauer and Deviso also dispatch Burnett drivers, the owner-operators/ICs, and Lake Erie drivers. (*Id.* ¶¶ 123-125.) From 1992 until the present, Burnett has owned approximately fifteen tractors or trucks and sixty trailers while Lake Erie's ownership of tractors or trucks has declined from three to one and its ownership of trailers has declined from eight to four. (*Id.* ¶¶ 90-93.)

From 1993 until 2004, Burnett used approximately sixteen owner-operator/ICs, some of whom were drivers on the payroll of Lake Erie. (*Id.* ¶¶ 44- 45, 171.) The ICs owned their own tractors or trucks; paid their own expenses and maintenance; had their own commercial driver's license; were issued Internal Revenue Forms 1099; and were paid sixty-five percent of the gross revenue derived by Burnett on each truckload of commodities hauled, or a flat rate as determined by Burnett. (R. 56-1, Pls.' Resp. to Defs.' Add'l Facts ¶ 165-169.) The owner-operator/ICs hauled exclusively for Burnett. (R. 44, Pls.' Exs., Ex. 23, IC Agreement.) Either party could terminate the agreement without cause if they provide thirty days notice or with cause, effective immediately. (*Id.*) The parties, however, dispute whether any of the owner-operator/ICs used by Burnett were former employees of Burnett, (*Id.* ¶ 170), but Burnett admits that some of its owner-operator/ICs had previously been drivers on Lake Erie's payroll, (R. 53-1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l Facts ¶ 153).

From January 1, 1993 to December 31, 2004, Lake Erie usually had approximately 14 drivers on its payroll other than occasional seasonal lay-offs in the winter months. (*Id.* ¶ 39.) Between approximately 1993 and 2000, Lake Erie used approximately six drivers on its payroll to haul commodities for Burnett using a bill of lading which listed Burnett as the company

7

hauling the commodity. (*Id.* ¶ 51.) From 2001 until the present, this number increased to approximately ten drivers. (*Id.* ¶ 52.)

## IV.    Burnett's Contributions to the Pension Fund

The Pension Fund relies upon participating employers to self-report the work history of their eligible employees. (R. 53-1, Defs.' Resp. to Pl.'s Facts and Defs.' Add'l Facts ¶ 27.) The self-reporting system requires participating employers to identify those employees for whom contributions are owed and the weeks worked by the covered employees. (*Id.*) Based upon the employee work history reported by the employer, the Pension Fund bills the employers for contributions. (*Id.*) Unless the employer notifies the Pension Fund of a change in the employment status of individuals listed on the bill, the Pension Fund assumes that there has been no change in the covered workforce from month to month and continues to bill for the same employees every month. (*Id.* ¶ 31.)

Burnett has been a contributing employer to the Pension Fund since at least 1990. (*Id.* ¶ 32.) From January 1, 1993 until December 31, 2002, Burnett reported the work history for two drivers. (*Id.* ¶ 129.) For the period subsequent to December 31, 2002, Burnett reported the employee work history for one driver. (*Id.* ¶ 130.) Burnett did not remit contributions on behalf of the drivers it designated as independent contractors, many of whom were former Lake Erie drivers. (*Id.* ¶¶ 43, 51-52.) From 1992 until the present, Burnett has not hired any drivers. (*Id.* ¶ 131.)

At some point, an audit was performed on Burnett and Lake Erie. (*Id.* ¶ 139.) As a result of the audit, it was determined that truck drivers on the payroll of Lake Erie were performing bargaining unit work, but this was not reported to the Pension Fund. (*Id.*) The audit revealed

8

that from January 1, 1993 through December 31, 2004, Lake Erie did not remit any contributions to the Pension Fund on behalf of the drivers on the payroll of Lake Erie who hauled cement. (*Id.* ¶ 49.) Burnett did not require Lake Erie to assume the CBAs between Burnett and the Union. (*Id.* ¶ 50.) As a result of the audit, it was also determined that Burnett was assigning bargaining unit work to drivers it had designated as ICs and for whom contributions had not been received by the Pension Fund. (*Id.* ¶ 140.)

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 249 (citations and quotations omitted). On summary judgment, the Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). When considering cross-motions for summary judgment, the Court will make all inferences in favor of the party against whom the motion under consideration was made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

9

## LEGAL ANALYSIS

Plaintiffs allege that Burnett and Lake Erie constituted a single employer and were jointly liable for contributions on behalf of Lake Erie drivers and the owner-operators/ICs. Plaintiffs also allege that Burnett and Lake Erie were alter egos and as such, they were jointly liable for contributions on behalf of Lake Erie drivers and the owner-operators/ICs. Finally, Plaintiffs argue that Burnett's transfer of work to Lake Erie and the owner-operators/ICs violated the work preservation clause contained in the labor contracts. We will examine each of these allegations in turn.

## I.    Contributions and the Lake Erie Drivers

The single employer doctrine states that "when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998). Courts look at the following criteria in determining whether two companies constitute a single enterprise: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Id.*

In the present case, Burnett and Lake Erie are a single entity. Burnett and Lake Erie satisfy the first and second factors: Bauer and Deviso have been responsible for the day-to-day operations of both companies since at least 1992; Bauer bids on the contracts for both companies; Deviso handles the finances of both companies; and both Lake Erie and Burnett drivers are supervised by Bauer and Deviso. Burnett and Lake Erie also share the same corporate counsel and the same accountant; its employees share the same 401(k) plan; and both companies are covered by a joint liability insurance policy. The companies share the same full-time office employee, the same premises, the same internet mail address, the same fax number, and

10

employees of both companies receive payment from Burnett, regardless of whether that employee is performing work for only Lake Erie or both companies.

Applying the third factor, there has never been any written agreements or contracts between Lake Erie and Burnett regarding Lake Erie drivers who drove trucks owned by Burnett to haul cement for Burnett customers. Furthermore, Burnett and Lake Erie shared the expenses incurred for drivers on the payroll of Lake Erie driving trucks owned by Burnett to haul cement for Burnett customers, but there was no formal allocation or division of the expenses between the companies. Applying the fourth factor, Burnett and Lake Erie have been owned fifty percent by Bauer and fifty percent by Borowiak since 1992, with both men serving as president or vice president of each company respectively. Based on an analysis of the evidence, Burnett and Lake Erie meet the single employer test and each must make contributions to the Pension Fund on behalf of the Lake Erie drivers. Because the single employer finding disposes of the question of liability for contributions on behalf of the Lake Erie drivers, this Court need not address Plaintiffs' alter ego theory or whether using the Lake Erie drivers violate the work preservation clause of the CBAs.[3] *See id.* at 332 n.10.

---

[3] The alter ego doctrine is similar to the single employer doctrine, but it also requires a finding that the second corporation is a "disguised continuance" of the employing enterprise, resulting in evasion of the employer's obligation under the labor laws. *Central States, Southeast & Southwest Areas Pension Fund v. Central Transp.*, 85 F.3d 1282, 1288 (7th Cir. 1996). As such, questions of motive and intent are paramount in alter ego analysis. *Id.* While it is likely that the Pension Fund has not presented enough evidence to win summary judgment on its alter ego claim because there are issues of fact with regards to Burnett's motive and intent, the single employer doctrine does not require a finding of anti-union motive as an element. *See Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 788 (7th Cir. 1993). Nor has the Seventh Circuit held that a court must apply any one doctrine in determining whether an employer owes contributions under ERISA. *See Moriarty*, 164 F.3d at 332 n 9.

11

## II.     Contributions and the Owner-Operators/ICs

### A. Independent Contractor vs. Employee Status

Although this Court has found that Burnett and Lake Erie are a single entity for purposes

of determining ERISA liability under the single employer doctrine, this does not resolve the

question of liability with respect to the owner-operators/ICs. Burnett asserts that the owner-

operators are ICs rather than employees; therefore, they are not liable for contributions on behalf

of these individuals. Plaintiffs, on the other hand, argue: that the owner-operators are employees

and not independent contractors, therefore Burnett is liable for contributions; or in the

alternative, if the owner-operators are ICs, Burnett is liable for contributions because it violated

the work preservation clause in Art. I, sec 1-3 of the CBAs. First, we must analyze the terms of

the CBA.

A CBA is not an ordinary contract for the purchase of goods and services, but is a

generalized code that creates a common law for a particular industry or plant. *Brotherhood of*

*Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 640 (7th Cir.

1997) (*quoting Transportation-Communication Employees Union v. Union Pac. R.R.*, 385 U.S.

157, 160-161 (1966)). To ensure the enforcement of these agreements, section 515 of ERISA

provides:

> Every employer who is obligated to make contributions to a multi-employer plan
> under the terms of the plan or under the terms of a collectively bargained
> agreement shall, to the extent not inconsistent with the law, make such
> contributions in accordance with the terms and conditions of such plan or such
> agreement.

29 U.S.C. § 1145. When considering an ERISA claim, federal common law rules of

interpretation apply. *GCIU Employer Retirement Fund v. Chicago Trib. Co.*, 66 F.3d 862, 864-

12

865 (7th Cir. 1995) (*citing Phillips v. Lincoln Nat'l Life Ins.*, 978 F.2d 302, 307 (7th Cir. 1992)).

One general contract principle that the Seventh Circuit applies to CBA interpretation is that "a document should be read as a whole with all its parts given effect, and related documents must be read together." *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783-784 (7th Cir. 2005). Furthermore, contract terms should be given "their 'ordinary and popular sense'" and the court should "avoid resort to extrinsic evidence when faced with unambiguous language." *Id* (citations omitted). Contract language is unambiguous if it is susceptible to only one reasonable interpretation. *Id.* Only if the language of the plan document is ambiguous and these ambiguities are not clarified elsewhere in the document may we consider evidence of the parties' intent that is extrinsic to the writing. *Id.* at 783-784.

In order to determine whether the owner-operators are employees, we first look at the contract language. At the very least, the CBAs are ambiguous with respect to this issue. The CBAs do not define the terms "owner-operator" or "employees." Viewing the owner-operators as employees raises a number of issues. If they are employees, then Art. XVI[4] is completely superfluous because owner-operators would be subject to the same restrictions and obligations as the employees governed by the CBAs and would not need to be addressed in another section. *Brown & Lacounte, L.L.P. v. Westport Ins. Corp.*, 307 F.3d 660, 663 (7th Cir. 2002) (stating that courts should not interpret contracts to render terms meaningless). Plaintiffs argue, however, that

---

[4] Art. XVI reads in pertinent part:

> If owner-operators are used they will comply with Article I, Union Security Clause of the present agreement.

> No owner-operator will be used if men are in lay-off status and company equipment is available.

13

without this provision, Burnett could shift part of the costs of the capitalization of its business to its drivers by laying them off in an effort to force them to buy a truck in order to continue to work as employee owner-operators at Burnett. There is no indication, from the face of this provision, that it is necessary for owner-operators to be employees in order for this provision to serve the purpose that Plaintiffs assert.

Plaintiffs further argue that courts view owner-operators as being common law employees; however, whether they are considered employees depends on the CBA at issue and the relationship between the parties. *See, for example, Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 960, 965 (7th Cir. 2001) (finding that while the CBA makes Defendants' owner-drivers employees, the relationship between the parties makes it clear that they are independent contractors); *Nestle Holdings, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund*, 342 F.3d 801, 802 (7th Cir. 2003) (stating that Nestle employed hundreds of owner-operators who were independent contractors). Plaintiff's reliance on *Illinois Conference of Teamsters Welfare Fund v. Mrowicki*, 44 F.3d 451 (7th Cir. 1994), is also misplaced as the CBA at issue there clearly defined an owner-operators as employees by its very terms—as "an individual, who, *in addition to being employed to perform services covered by this Agreement* is also the owner of the equipment he uses." *Id.* at 454 (emphasis added).

Viewing the owner-operators as ICs is also consistent with the relationship between the parties, which is another factor the Court must consider. *See Mazzei*, 246 F.3d at 965 ("Contractual language alone cannot transform a contractor/independent contractor relationship into an employer/employee relationship. To determine the employment status of an individual or group, we must, as we have in this case, evaluate the actual employment relationship.") (citations

14

omitted). In determining whether an individual is an IC or an employee, courts consider five

factors:

> (1) the extent of the employer's control and supervision over the worker,
> including directions on scheduling and performance of work, (2) the kind of
> occupation and nature of skill required, including whether skills are obtained in
> the workplace, (3) responsibility for the costs of operation, such as equipment,
> supplies, fees, licenses, workplace, and maintenance of operations, (4) method
> and form of payment and benefits, and (5) length of job commitment and/or
> expectations.

*Id.* at 963. Of the factors considered, the employer's right to control is the most important when

determining whether an individual is an employee or an individual contractor. *Id.* Applying the

first factor, Burnett exerted very little control over its owner-operator/ICs. While Burnett had the

ability to tell owner-operator/ICs when to pick up and/or deliver a load of materials, this amounts

to "little more than the basic level of supervision required to ensure that the arrangement between

[Burnett] and its owner-drivers is of some value to [Burnett]." *Id.* at 964. Although the owner-

operator/ICs hauled exclusively for Burnett, either party could terminate without cause after

giving thirty days notice, or terminate with cause, effective immediately. *See id.* at 965 (finding

that an individual was an IC where the IC could cancel the lease at any time and for any reason

without penalty).

As for the second factor, it is not clear whether the skills possessed by the owner-

operator/ICs were obtained in the workplace, but it is likely that these individuals were already

professional drivers since they owned their trucks and possessed their own commercial driver's

licenses. As "professional drivers . . . could be either employees or independent contractors," the

second factor does not favor a finding of either independent contractor or employee status. *Id.*

In terms of the third factor, in addition to owning their own trucks, the owner-

15

operator/ICs are also responsible for their own maintenance and expenses and receive no benefits. This is a strong indication that these individuals are ICs. *See id.* (citing *EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (finding that bus drivers who owned their buses and paid their own expenses were independent contractors)).

The fourth factor in the analysis—the method and form of payment and benefits—also suggests that the owner-operator/ICs were in fact ICs. They were paid on a Form 1099 basis, a factor that the Seventh Circuit has held is indicative of independent contractor status. *See Mazzei*, 246 F.3d at 965 (stating that payment on a Form 1099 basis is "non-employee compensation" and would be "appropriate for independent contractors."). The owner-operator/ICs also receive sixty-five percent of the gross revenue derived by Burnett on each truckload of commodities hauled, or a flat rate as determined by Burnett, also indicative of independent contractor status as opposed to receiving an hourly wage. *See id* at 965.

For the fifth factor, Plaintiffs argue that these individuals hauled exclusively for Burnett and had the same commitments as those individuals actually employed by Lake Erie (and under the single employer theory, by Burnett). However, Burnett or the ICs could terminate the IC agreement without cause, and that the IC agreement was a renewable one year contract. *See Mazzei*, 246 F.3d at 965 (stating that being able to cancel the lease at any time without penalty "can hardly be characterized as the type of commitment consistent with that of an employer-employee relationship"). The length of the job commitment and/or expectations was minimal. Furthermore, the other factors in the analysis—that the owner-operators/ICs did not receive any benefits, were paid by Form 1099, were responsible for their own maintenance/expenses, and subject to minimal control by Burnett—weigh in favor of

16

independent contractor status. As the Plaintiff has the burden, without more we cannot find that these individuals are Burnett employees rather than simply ICs. *See Ost v. West Suburban Travelers Limousine*, 88 F.3d 435, 438 (7th Cir. 1996) (stating that plaintiff has the burden of proof in determining whether an individual is an employee or an independent contractor); *N. Knox Sch. Corp.*, 154 F.3d at 747 (7th Cir. 1998) (rejecting the plaintiff's argument that the independent contractor question is a factual one requiring denial of summary judgment where there are some facts support a finding that an individual is an employee because "the ultimate question of whether an individual is an employee or an independent contractor is a 'legal conclusion' which involves 'an application of the law to the facts.'"). Based on the language of the CBAs and the five factor analysis, we find that the owner-operators were ICs.

**B.      Work Preservation Clause**

Since we have determined that the owner-operators are ICs, Plaintiffs have advanced alternative arguments that: 1) Burnett violated the work preservation clause in Art. 1, sec. 1-3[5] of the CBAs by transferring work to individuals other than those covered by the CBAs; and 2)

---

[5] Article 1, Section 1-3 of the CBAs in effect for the period of July 1, 1990 to December 31, 2008 provide in relevant part:

> 1-3. The employers agree to . . . not direct or require employees or other persons, other than the employees in the bargaining unit here involved, to perform work which is recognized as the work of the employees in said unit.

(R. 44, Pls.' Exs., Ex. 7, Cement Haulers Agreement at 1.)

Burnett violated Art I, sec. 1-5[6] which prohibits the use of any leasing device to evade the obligations of the CBA. If Burnett has violated these provisions, then it owes contributions for its ICs.

Defendants argue that Article I, by its terms, applies only to employees and not ICs. The "other person" language in section 1-3, however, would cover non-union employees as well as independent contractors. Therefore, the prohibitions in Article I, section 1-3 and Article 1, section 1-5 would apply to employees and Burnett's independent contractors. Article I, in general, relates to union security, although its specific provisions cover a variety of subjects related to that topic and one provision might relate to employees while others might discuss non-union employees or independent contractors. *Id.*; *Chicago Painters & Decorators Pension v. Karr Bros., Inc.*, 755 F.2d 1285, 1288-1289 (7th Cir. 1985) (finding that a work clause requiring that bargaining unit work be done only by employees implicitly prevented the assignment of bargaining unit work to non-employees, whether they be independent contractors or non-union employees). Reading Article I as a whole makes it clear that depending upon which section is at issue, its provisions apply to covered employees, non-covered employees, and ICs, and none of these provisions are inconsistent with each other, thereby forcing us to resort to extrinsic evidence to resolve any ambiguities. *See Carr v. Gates Health Care Plan*, 195 F. 3d 292, 298 (7th Cir. 1999) ("It is a well-settled principle of contract construction that where a contract

---

[6] Article 1, Section 1-5 of the CBAs in effect for the period of July 1, 1990 to December 31, 2008 provide in relevant part:

1-5. It is understood by this section that the parties hereto shall not use any leasing device to a third party to evade this Contract.

(R. 44, Pls.' Exs., Ex. 7, Cement Haulers Agreement at 1.)

18

contains both general and specific provisions relating to the same subject, the specific provision controls.").

When read together, Article I. and Article XVI provide that Defendants could subcontract non-bargaining unit work, and they could use owner-operators for bargaining unit work when there are no workers in lay off status and company equipment is unavailable. Burnett argues that because no employed driver under the agreement was ever laid off because of its subcontracting of cement hauling, it did not violate the term of the CBAs. From January 1, 1993 until December 31, 2002, Burnett made pension contributions for the two drivers on its payroll. For the period subsequent to December 2002, Burnett reported the work history for only one driver. Burnett further admits that from 1992 until the present, it owned approximately 15 tractors or trucks and 60 trailers. (R. 53-1, Defs.' Resp. to Pls.' Facts and Defs.' Add'l facts ¶¶ 90-91.) While it is not clear if one driver was laid off or quit during the relevant time period, it is certainly clear that there was company equipment available. Art. XVI requires that both of these factors be present—no workers in lay-off status and no company equipment be available—before Burnett can resort to using owner-operators. Consequently, Burnett violated Art. I, sec 1-3 of the CBAs, and we need not reach the question of whether Burnett violated sec. 1-5.

If we were to reach this question, it is possible that we may find that Burnett violated sec. 1-5 of the CBAs. There is evidence in the record that might lead a reasonable jury to conclude that Burnett was seeking to evade its obligations under the CBA—for example, the fact that Burnett and Lake Erie were essentially the same company; some of the ICs were former Lake Erie employees; and neither the Lake Erie drivers nor the ICs were required to assume the CBA. However, while this behavior is certainly questionable, it does not lead inescapably to the

19

conclusion that no reasonable jury could find that Burnett's motivations were benign. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991) ("Summary judgment is only appropriate when no reasonable jury could find for the non-moving party.") (citations omitted). Furthermore, while issues of motive and intent do not necessarily preclude summary judgment, *see Rush v. McDonald's Corp.*, 966 F.2d 1104, 1109 (7th Cir. 1992), it is clear that any inquiry into intent is very heavily fact laden and not always ripe for resolution at this stage. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir. 1992) (stating that "summary judgment is 'notoriously inappropriate' where intent at issue") (citations omitted); *see also Arla Lab., Inc. v. Am. Cyanamid Co.*, 1999 WL 160710, * 8 (N.D. Ill. March 11, 1999) ("Where intent and knowledge are at issue, courts should be reluctant to grant summary judgment, whatever the context.").

## CONCLUSION

Plaintiffs' motion for partial summary judgment as to the question of liability is granted, (R. 41-1), and Defendants' motion for summary judgment is denied, (R. 40-1). The Clerk of the Court is directed to enter a judgment on liability in favor of Plaintiffs. The Court will retain jurisdiction to enter an exact monetary judgment.

The parties are hereby given until September 20, 2006, to present an agreed final monetary judgment which fully complies with this opinion. If such an order cannot be entered by agreement, the parties should file a joint status report on that date, which outlines the scope of any remaining damages disputes and proposes a litigation schedule to resolve these potential disagreements.

A status hearing will be held in open court on September 26, 2006, at 9:45 a.m.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** August 31, 2006